IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 07-00095 |
| Plaintiff, | |
| vs. | **REPORT & RECOMMENDATION** |
| JOHNNIE FORTNER, | **re Motion to Suppress** |
| Defendant. | |

This matter is before the court on a motion to suppress filed by defendant Johnnie Fortner. The court held an evidentiary hearing on January 22, 2008. Upon review of the testimony and evidence adduced at the hearing and with due consideration of the parties' argument and applicable caselaw, the court hereby issues the following report and recommends the denial of the motion.

## FACTUAL FINDINGS[1]

On October 8, 2007, Kelly Francisco, the co-defendant herein,[2] was arrested by the Guam Police Department for the offense of possession of a controlled substance, namely "ice," and then transported to the Hagåtña Precinct. Sergeant James T. Santos ("Sergeant Santos"), a GPD officer with more than 20 years of experience, supervised Mr. Francisco's arrest. Sergeant

---

[1] To the extent that a finding of fact should be deemed a conclusion of law, or a conclusion of law deemed a finding of fact, it shall so be considered and incorporated.

[2] Mr. Francisco had initially joined in the motion to suppress but later withdrew his joinder after he could not establish his standing to join in said motion. See Docket Nos. 37 & 39.

Santos testified that this arrest occurred some hours before the search at issue here. Sergeant Santos later learned that while at Hagåtña Precinct, Mr. Francisco made a telephone call to his residence[3] and spoke with his girlfriend Johnnie Fortner ("Ms. Fortner"), the Defendant herein.

Sergeant Santos and fellow officer Benny Babauta rode their police motorcycles to the area, since they were curious as to whether there was any "activity" going on at Mr. Francisco's residence. They arrived at Dairy Mart, located just up the hill and less than one-quarter mile from Mr. Francisco's residence, at approximately 4:40 a.m. on October 9, 2007. Because it had just started to rain, they parked their motorcycles under the overhang of Dairy Mart. Sergeant Santos estimated that about five to ten minutes later he noticed a Miata drive by and turn left onto Blas Street. Sergeant Santos stated that the Miata caught his attention because its rear license plate light was not illuminated, a violation of Guam law. Sergeant Santos testified that about 15 to 20 minutes later he again saw the Miata leave Blas Street and turn right onto Dairy Road. Sergeant Santos radioed police officer Joel P. Verango ("Officer Verango")[4] and instructed him to pull the vehicle over based on the faulty rear license plate light.

Officer Verango testified that he was driving a police vehicle on routine patrol in the Mangilao area when Sergeant Santos radioed him and instructed him to "make a check" of the Miata that had just exited Blas Street and was traveling on Dairy Road because the vehicle's rear license plate light was not working. Officer Verango stated that he interpreted Sergeant Santos's instructions that he "make a check" of the vehicle to mean that he (Officer Verango) should follow the vehicle to see if it commits any other violation, but regardless of whether another violation is found or committed, Officer Verango should pull over the vehicle because of the faulty rear license plate light.

Officer Verango saw the Miata heading west on Dairy Road toward Maimai Road and noticed that the Miata's rear license plate light was not illuminated. He continued to follow the

---

[3] Sergeant Santos stated that Mr. Francisco's residence was located just off of Blas Street in Mangilao, Guam,

[4] Officer Verango testified that he has been a GPD officer for approximately seven years.

Miata for approximately one mile. Officer Verango stated that traffic in the area was very light at that time. He observed the Miata swerving into the oncoming lane about four times. Believing that the driver was possibly driving under the influence of alcohol, Officer Verango finally stopped the vehicle.

The Miata pulled over to the side of the road, and Officer Verango approached the driver, who was later identified as Joshua Ulloa. Officer Verango also saw two other female passengers in the vehicle.[5] The passenger sitting on the center console was later identified as Christine Duenas. The other individual sitting in the passenger seat was later determined to be Ms. Fortner.[6] Officer Verango explained to Mr. Ulloa why he had been pulled over. Mr. Ulloa apologized and told Officer Verango that he was just trying to avoid the speed bumps in the area.[7] Officer Verango testified that he believed Mr. Ulloa was acting "suspiciously" because Mr. Ulloa stuttered as he spoke, avoided making eye contact, and kept looking at the passenger floorboard. Additionally, Officer Verango testified that both female passengers were acting nervously based on his observation that their legs were shaking in an up and down motion and Ms. Fortner's hands were shaking as well.

About a minute or two after the initial pull over, Sergeant Santos arrived at the scene and walked up to the passenger side of the vehicle. He proceeded to speak with the female passengers while Officer Verango dealt directly with Mr. Ulloa.

Officer Verango then asked Mr. Ulloa to step out of the Miata. They proceeded to the rear of the vehicle, and Officer Verango then conducted a pat down of Mr. Ulloa's person. No contraband or weapons were found on Mr. Ulloa.

At some point thereafter, Ms. Duenas and Ms. Fortner were asked to exit the vehicle.

---

[5] Officer Verango testified that the seating capacity for the Miata was only two.

[6] Ms. Fortner originally used her maiden name and identified herself as "Johnnie Rosario."

[7] Curing cross examination, Officer Verango confirmed that the stretch of road from Dairy Road to Maimai Road had many speed bumps of varying sizes, including some that did not span the entire width of the road.

Officer Verango and Sergeant Santos testified that Ms. Fortner then became upset and belligerent, yelling "f**k you guys." The women were then handcuffed and secured in separate patrol vehicles that had arrived at the scene. Sergeant Santos testified that the female passengers were asked to exit the Miata because the officers were about to get Mr. Ulloa's consent to search the vehicle, and for safety reasons, he thought it was best to secure the remaining occupants while the officers concentrated their attention on the vehicle search and Mr. Ulloa.

Officer Verango then asked Mr. Ulloa for permission to search the Miata for any weapons or illegal drugs. Officer Verango testified that he used a normal, conversational tone of voice when asking Mr. Ulloa for consent to search the vehicle. Mr. Ulloa agreed, saying, according to Officer Verango, "yes, go ahead and search." With Mr. Ulloa standing un-handcuffed by the front of the vehicle, Officer Verango proceeded to search the interior of the Miata while Sergeant Santos observed. Officer Verango found no weapons or drugs in the interior of the vehicle.

Officer Verango then asked if he could search the trunk area, and Mr. Ulloa said "sure, go ahead, search." The car keys were still in the ignition, so Officer Verango retrieved the keys and handed it to Sergeant Santos. Officer Verango, Sergeant Santos, and Mr. Ulloa then walked to the rear of the vehicle. Sergeant Santos knew Mr. Ulloa from a prior narcotics investigation involving Mr. Ulloa. Sergeant Santos asked Mr. Ulloa if he was okay, to which Mr. Ulloa responded he was fine. Before Sergeant Santos opened the trunk, Mr. Ulloa stated that the locking mechanism was broken so there may be a problem in opening the trunk. Sergeant Santos put the key in the lock, and the trunk opened without difficulty.

In the trunk, Sergeant Santos and Officer Verango saw various bags, including a large black bag to the left of the trunk, a large plastic trash bag in the center, and two smaller bags located on the right side of the trunk. See Exhibits 3 and 5. All these bags were closed but not locked. None of the bags had identifying tags or marks that indicated who owned them. Sergeant Santos placed his hand on the black bag on the left side of the trunk and felt that it was hot to the touch. Sergeant Santos testified that it was not readily apparent to him after touching

the bag what was inside it. He then unzipped the black bag and saw a can of Drano and a hot pot therein. At this point, Mr. Ulloa stated that he owned nothing in the trunk and everything belonged to Ms. Fortner. Based on his training and experience, Sergeant Santos believed that these items were associated with a "meth lab." Thus, he immediately directed everyone away from area and established a perimeter until the Violent Street Crimes Task Force and the DEA Task Force arrived, so that its "HAZMAT" unit could contain the area.

A thorough search of the bags in the trunk was later conducted. Additionally, all the occupants of the Miata were transported to the Hagåtña Precinct. Mr. Ulloa and Christine Duenas were later interviewed. Based on their statements, the earlier arrest of Mr. Francisco, and evidence gathered at the scene of the pullover, including evidence obtained from the bags in the trunk, a federal search warrant[8] was obtained to search Mr. Francisco's residence, where items were found consistent with a drug lab and the manufacturing of methamphetamine.

On December 3, 2007, the Defendant filed the instant motion to suppress. (Docket No. 29.) On December 10, 2007, the Government filed its Opposition to the motion. (Docket No. 34.) On January 11, 2008, the Defendant filed her Reply to the Opposition. (Docket No. 45.)

## LEGAL CONCLUSIONS

The Defendant argues that suppression of her belongings in the trunk of the Miata is warranted because the search of her these bags were not supported by probable cause nor did the officers have consent to search her belongings. The Defendant contends that "[t]he issue here is whether a third party, [Mr.] Ulloa, can consent to a search of a passenger['s], [Ms.] Fortner's, purses and a bag located in the trunk of the Miata." Motion (Docket No. 29) at 4.

While the parties focus their arguments on the consent issue, the court begins its

---

[8] Defense counsel stated that the discovery materials provided by the government did not include a copy of the search warrant application nor a copy of the search warrant itself. If the government intends to offer any of the evidence obtained as a result of the warrant against the Defendant at trial, then the court directs the government to provide the Defendant with copies of the search warrant application and the search warrant.

analysis with the legality of the initial stop of the vehicle by Officer Verango. The Fourth Amendment protects people against "unreasonable searches and seizures." "An automobile stop is subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren v. United States, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. Id. "Probable cause exists when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Wallace, 213 F.3d 1216, 1220 (9th Cir. 2000) (quotations omitted). "The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop." Wallace, 213 F.3d at 1219. See Whren, 517 U.S. 806 (Supreme Court held that the constitutionality of a traffic stop does not depend on the subjective intent of the officers). The court finds that the pull over of the Miata was supported by probable cause based upon (1) the non-functioning rear license plate light, which is a violation of Guam traffic laws, and (2) the erratic driving observed by Officer Verango when the Miata swerved into the oncoming lane of traffic. Having concluded that the initial stop was lawful, the court must next determine whether the search of the vehicle and the bags in the trunk were legal as well.

Based on the limited information known at the time, the police did not have probable cause to search either the vehicle or bags. Thus, the government must establish that the search was based on the valid consent of someone capable of so consenting. The government has the burden of establishing a third party had authority to consent to the search of property to which persons have joint access. Illinois v. Rodriguez, 497 U.S. 177, 180 (1990).

The Government contends that Mr. Ulloa properly consented to the search of his vehicle to include the closed containers located in the trunk of the Miata. The Government bases its assertion on the case of Florida v. Jimeno, 500 U.S. 248 (1991). In Jimeno, a police officer overheard the defendant arranging what appeared to be a drug transaction over a public telephone. The officer followed the defendant's vehicle and eventually made a traffic stop after the vehicle failed to stop at a stop sign. The officer advised the defendant he committed a

traffic violation and further stated that he believed the defendant was carrying narcotics in his car. The officer asked for permission to search the car, and the defendant consented. The officer later discovered a folded brown paper bag on the floorboard on the passenger side. He opened the bag and found a kilogram of cocaine. The defendant argued that although he had consented to the search of the vehicle, said consent did not include the specific consent to open closed containers, including the closed paper bag, and examine its contents. The trial court suppressed the evidence, and the Florida District Court of Appeal affirmed, establishing a *per se* rule that "consent to a general search for narcotics does not extend to 'sealed containers within the general area agreed to by the defendant.'" Id. at 250. The Supreme Court reversed, holding that the suspect's general consent to search a vehicle extended to the search of closed container's within the automobile. Id. at 251. The Supreme Court found it was "objectively reasonable for the police to conclude that the general consent to search [defendant's] car included consent to search containers within that car." Id.

The Government argues that Mr. Ulloa had the actual and apparent authority to consent to the search of his vehicle, including the closed containers in the trunk, because he had "common authority" over the property located in the trunk of his vehicle. The court must examine whether it was "objectively reasonable" for the police to conclude that Mr. Ulloa had the authority, whether actual or apparent, to consent to the search of his vehicle, including the trunk area and the closed containers therein.

The Defendant cites to the case of United States v. Welch, 4 F.3d 761 ( 9th Cir. 1993), where the Ninth Circuit Court of Appeals concluded that one occupant of a vehicle did not have actual authority to consent to a search of another party's property, and that a reasonable officer would not have concluded that the occupant had apparent authority to consent to the search. In Welch, the defendant and her co-defendant McGee were gambling and suspected of passing counterfeit money. They were detained and separately questioned by casino security. McGee gave consent to search the vehicle that he and the defendant had driven. Security officers found several pieces of luggage and a woman's purse in the vehicle. The officers opened the clasp of the purse and discovered the defendant's driver's license and $500 in counterfeit bills. The

Ninth Circuit stated the "real question was whether McGee's consent served to authorize the search of [defendant's] purse, which was located in the trunk of the car." Id. at 763. The answer to this issue depended on "whether McGee had the *authority*, either actual or apparent, to give effective consent to the search of his companion's purse." Id. at 764 (emphasis in original). The government could establish the effectiveness of a third party's consent in three ways.

> First, the government can come forward with persuasive evidence of both shared use *and* joint access to or control over a searched area, which would demonstrate actual authority to consent. Second, it can show that the owner of the property to be searched has expressly authorized a third party to give consent to the search. Finally, it may establish consent by means of the "apparent authority doctrine."

Id. (emphasis in original; internal citations omitted). The Ninth Circuit concluded that although the defendant had a limited expectation of privacy in the car by virtue of her sharing arrangement with McGee, this did not mean that she had similarly limited privacy expectations in items within the car over which only she had control. Since the government failed to show shared control with respect to the purse, the government could not then argue that McGee's had actual authority to consent to the search of the closed purse. The record was also devoid of the defendant expressly authorizing McGee to consent to the search of her purse. Finally, the Ninth Circuit concluded that the facts known to the officers at the time of the search (that defendant was McGee's girlfriend, she traveled with him in the car, and the purse belonged to a woman) did not support the application of the apparent authority doctrine. Id. at 765. The Ninth Circuit found that even if the security officer *subjectively* believed that McGee had the authority to consent to the search of the purse, such a belief was not reasonable under the circumstances. Id. The Defendant contends that the facts here are more similar to Welch than Jimeno, and just like Welch, the court should deem the search herein unlawful.

In this case, as the driver of the vehicle Mr. Ulloa had the actual and express authority to consent to the search of his entire vehicle, including the trunk. Speaking in a normal tone of voice, Officer Verango requested permission to search the vehicle for drugs and weapons. Mr. Ulloa was not in custody at the time nor was he handcuffed. He was standing on a public roadway, and the police did not have their weapons drawn. Based on these facts, the court finds

that Mr. Ulloa knowingly, voluntarily and expressly consented to the search of the Miata. Because Ms. Fortner never consented to the search of her bags nor did she ever expressly authorize Mr. Ulloa to consent to a search of her belongings, the next issue for the court to determine is whether Mr. Ulloa's consent extended to the search of the bags in the trunk.

The government asserts that Mr. Ulloa had actual authority to consent to such a search. The government argues this is so because Mr. Ulloa owned the vehicle and helped load the bags into his trunk. Additionally, because the bags were placed into a vehicle that was driven on public roadways, the government contends that Ms. Fortner had a diminished expectation of privacy in her belongings.

The court disagrees with the government's contention and finds that it has not presented persuasive evidence of both shared use *and* joint access to or control over Ms. Fortner's bags. The mere fact that Mr. Ulloa drove to the residence to pick up Ms. Fortner and then assisted in loading her closed bags into the trunk of his vehicle does not transform the nature of the bags as belonging to Mr. Ulloa as the government contends. Mr. Ulloa was at the residence a mere 20 minutes. He did not own the bags, nor did he share it their use. He merely placed them in the trunk of his car. The government has not presented any other evidence to show that Mr. Ulloa had extended contact with or control over the bags. In fact, based on the officers' testimonies, it would appear that Mr. Ulloa's only connection with the closed bags was time span of less than 30 minutes. Without more, this brief tie to Ms. Fortner's closed bags does not bestow upon Mr. Ulloa the actual authority to consent to a search of them. Accordingly, the court finds that Mr. Ulloa lacked the actual authority to consent to a search of Ms. Fortner's closed bags in the trunk of his vehicle.

Although Mr. Ulloa lacked actual authority to consent, the court must still determine whether Mr. Ulloa had the apparent authority to consent to their search. In other words, was it objectively reasonable for the police to believe that Mr. Ulloa's consent extended to the closed bags in the trunk? What would the typical reasonable person have understood by the exchange between the officers and Mr. Ulloa? Mr. Ulloa expressly consented to the search of the interior of the Miata. The police officers then separately requested permission to search the trunk, and

Mr. Ulloa again agreed. Mr. Ulloa went so far as to state that the officers may experience some difficulty in opening the trunk. When the officers opened the trunk, they saw several bags that contained no identifying labels indicating who owned them. Thus, it was objectively reasonable for the police to believe that they belonged to Mr. Ulloa. When Sergeant Santos put his hand on the black bag, Mr. Ulloa said nothing. When Sergeant Santos proceeded to unzip the black bag, Mr. Ulloa remained silent. It was only after the bag was completely unzipped and the police saw the Drano and hot pot did Mr. Ulloa state that the bags did not belong to him but to Ms. Fortner. By making this statement, Mr. Ulloa limited the scope of his consent and placed the police on notice that he no longer had the "apparent authority" to consent to the search of the bags. Thus, at that point, just as in Welch, it was no longer objectively reasonable for the police to believe that Mr. Ulloa could validly consent to a further search of the bag. See also United States v. Infante-Ruiz, 13 F.3d 498 (1st Cir. 1994).[9] The police should have immediately stopped the search based on a lack of consent. The search of the bag could continue if the police either obtained Ms. Fortner's consent or if the police had probable cause to believe that the bags contained contraband. See United States v. Ross, 456 U.S. 798 (1982).

As the Supreme Court stated in Illinois v. Gates, 462 U.S. 213 (1983), "[p]robable cause

---

[9] In that case, the defendant and two others were in a rental vehicle and stopped to buy food. Officers surrounded the vehicle to execute an outstanding arrest warrant for the defendant. The officers asked the driver (de la Paz) for consent to search the vehicle. De la Paz verbally consented. When asked for the key to open the trunk, de la Paz handed over the key. Two briefcases were found within the trunk. De la Paz stated he owned the brown briefcase, and it was opened and searched while de la Paz stood by without objection. The officer asked who owned the black briefcase, and de la Paz answered that it belonged to the defendant. The officer opened the unlocked briefcase and found a firearm in it. The defendant moved to suppress the gun, arguing that de la Paz lacked authority to consent to the search of the black briefcase. "The evidence showed that de la Paz had access to the briefcase for several days and that de la Paz's property was co-mingled with [the defendant's] inside the briefcase." Id. at 504. Thus, it appeared that "de la Paz had sufficient authority over the briefcase to consent to its search if he in fact had chose to do so." Id. Nevertheless, the First Circuit Court of Appeals found "[i]t was not reasonable . . . for the police officers to have believed that de la Paz gave his consent to the search of [the defendant's] briefcase. " Id. The court stated the scope of de la Paz's consent did *not* include defendant's briefcase because the "general permission to search the car and its trunk was qualified by de la Paz's further statement to the officer, before the latter opened and searched the briefcase, that the briefcase belonged to [the defendant]." Id. at 505.

is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232. Probable cause to search is established where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 214. In determining the existence of probable cause, the court is entitled to rely upon the training and experience of police officers. United States v. Gil, 58 F.3d 1414, 1418 (9th Cir. 1995) (citing United States v. Arrellano-Rios, 799 F.2d 520, 523 (9th Cir. 1986) ("The experience of a trained law enforcement agent is entitled to consideration in determining whether there was probable cause.").

In the instant case, Sergeant Santos knew that Ms. Fortner's boyfriend (Mr. Francisco) had just been arrested a few hours before the search at issue here for possession of methamphetamine. He knew that Mr. Francisco had placed a call to Ms. Fortner. He also knew that Mr. Ulloa was previously involved in a narcotics investigation. From his experience and training, Sergeant Santos knew that contraband was commonly hidden in containers in vehicles, including the trunk. He was also aware of the ingredients and equipment used in the manufacturing of methamphetamine, to include items such as Drano and cooking pots. The possession of these everyday items may not cause concern in the average citizen, but given the totality of the circumstances and the training and experience of the officers, the court finds that the police had probable cause to continue searching Ms. Fortner's bags. Accordingly, the court finds nothing illegal in the search of Ms. Fortner's bags or the subsequent investigation that stemmed therefrom.

**RECOMMENDATION**

The court hereby recommends the Chief Judge adopt the findings of fact and conclusions of law as set forth herein and enter an order denying Ms. Fortner's motion to suppress in its entirety.

IT IS SO RECOMMENDED.

/s/ Joaquin V.E. Manibusan, Jr.
U.S. Magistrate Judge
Dated: Jan 31, 2008